Good morning. Gary Sobiger representing Mr. Nguyen, petitioner on this case. I'd like to discuss a couple of the issues. I know there are several others as well, but the ones that I was planning on concentrating on would be the Convention Against Torture and the ineffective assistance of counsel, and, of course, anything else, any other questions that you have. Mr. Nguyen is not the garden-ready individual who may have been stopped one time in their country by accident or has written some materials that he thinks could get him in trouble. Mr. Nguyen is just the opposite. Hardly will we see somebody who has taken such a public position, has done so much in trying to change a government that he feels strongly is contrary to the good of the people who live in Vietnam. He has not hidden his public participation. In fact, he likes to be a very public figure so that individuals will know of his work and of his ideas in making those significant changes in Vietnam. The Convention Against Torture states that it has to be more likely than not that Mr. Nguyen will be tortured if returned to Vietnam. The definition is broad. Torture is any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for purposes such as obtaining information, punishing him, intimidating or coercing him, or for any reason based on discrimination. The inflictor can be either the government or it can be an individual who is supported by the government or the government has a blind eye, as they say, towards that serious torture. Thank you. Can I ask you a preliminary question? If someone is deemed inadmissible, can they file for cap relief anyway? Yes, they can. Yes. It's for anybody inside the United States, which he is. And of course that makes sense because we wouldn't want to send someone back to a country to be tortured simply because they may be found inadmissible when they come to the United States. And that's by any means done in our country by any means. That's correct. Interesting. So the old distinction about applying for admissibility at the border versus actually being here in some kind of status is no longer the analysis? Well, not for purposes of the Convention Against Torture. The Convention Against Torture would apply equally to anybody in the United States. Well, I guess what's confusing about the facts here are he was paroled in for purposes of prosecution in the Central District of California and was convicted there of misuse of a passport in aid of international terrorism and he went to prison. Presumably his parole status expired at some point, but then he would revert back to the status of being inadmissible because he was out of the country for so long. Is that the position the government has taken here? That's the government's position, yes. And why do you disagree with his current status? Is that of an inadmissible alien? Is it not? He's not here under any other status. Well, of course, so the question has nothing to do with Convention Against Torture as I understand it. I'm trying to figure out what forms of relief are available to him. You've taken the position that he's here, but in law he's deemed to be inadmissible as a result of the fact that he was not admitted to the country under any form of status. He was paroled in for purposes of criminal prosecution. Yes. Where does that leave us, I guess, is what I'm really asking. Well, there are different defenses that he might have. He only applied for one, which is Convention Against Torture. He gave up all the other forms of relief that we might have. Well, his attorney did, his prior attorney did, yes, without his consent, without his knowledge. So his attorney wrongfully thought that there were other defenses that he was ineligible for. The judge didn't tell him of the availability of those defenses, and his lawyer certainly did not either. And so the only thing he applied for in court was the Convention Against Torture protection. Is your position that he didn't know about these other forms of relief? Because I thought his lawyer had initially asked for them, and in the middle of proceedings essentially gave up those other forms. That's correct. That's correct. What would the immigration judge have accomplished by advising him about the forms of relief that his lawyer had just indicated he was waiving or not pursuing? Well, in the court, actually, there was a written document in which he gave up those rights that was filed with the court. If the judge had said, well, you know, you wanted to apply for these defenses, asylum and withholding of removal, cancellation of removal, you had said in court that you were thinking of applying for it, do you still want to? Do you want to give it up? It would be nice and legally correct if the judge had mentioned that. He may have had a very different response than the response that was given in writing by his attorney without the knowledge of the decision. But it was done in his presence, right? I mean, he was there when the attorney did that, right? This happened in the courtroom in the middle of the merits hearing. I know there was a document that the attorney filed in court. I'm not sure if this was specifically said in court. It may have. As I read the record, that's what happened. And the question that occurred to me is, if he disagreed with that, why didn't he say something? He could easily have stood up and said something. Was it all being interpreted at the same time? There is an interpreter that he utilized because he speaks very little English. The interpreter did a simultaneous translation, not a very good one, as you can tell from reading the record. But there was an interpreter. It's really, you know, for an individual who doesn't speak the English language and has an attorney, it's not easy to kind of stop the proceedings and say, you know what, I want to discuss this issue. That's why the judges have the affirmative responsibility to make an individual aware of all potential defenses they may have. And it's also the attorney's role to be effective to make sure that the client knows what potential defenses there are and that you are going to waive them. I suppose you have to have a pretty good idea of why you want to waive a potential defense, you know, to give that up to a person who may be deported back to Vietnam, in his case. I mean, this is a very unusual merit hearing in that it lasted three days, and he put on more witnesses than the government did, all of whom, as near as I can tell, were focused on the relief he was seeking, which was relief under the Convention Against Torture. Yes. So why isn't that a tactical decision that his lawyer made? I mean, this is more than we usually see in these kinds of cases. It's a pretty robust record. It was – there were a lot of witnesses for the petitioner on the Convention Against Torture claim. There would be no benefit in a Convention Against Torture claim to give up other non-related forms of relief. The worst that would happen is the judge would have found him ineligible, or they would have filed briefs on the issue. Well, he would have been ineligible for some forms of relief, depending on how we rule on the disabilities from his prior convictions, correct? That's right, yes. Wouldn't that be a factor that the lawyer would consider in deciding not to spend a lot of time and effort on issues that, under the Act, he's statutorily ineligible for? Well, I don't believe that he was or is ineligible for those forms of relief. 273.5D of the California Penal Code, the spousal abuse, isn't that a disqualifying conviction? The government said it was for cancellation of removal, perhaps, although when I looked at the record, I was not the attorney, obviously, at the removal proceeding in front of the judge. But I noticed that there is a police report that was accepted into evidence saying that the victim was not his wife, and there is, I believe, a case in the Ninth Circuit that says it's not a crime involving moral turpitude if the victim is not your spouse. I think our law is the direct contrary. Well, at least the California statute includes cohabitants who are not married. Right. So the question is whether it was a conviction involving moral turpitude, and if it was, would it have broken the required presence of residents in the United States? Well, the board found that it did, did it not? I mean, they referenced it in their ruling, in their written opinion. They did find it, but they didn't use it for any purpose other than mentioning it. As an alternative ground for why he was not entitled to relief, as I read it. I mean, it's the same thing we do in our opinions all the time. They mentioned it in the board decision, but it was not mentioned for purposes of removability. They said in there that their only basic removability on what they thought was the conviction involving the passport, and that was a crime involving moral turpitude, and that was the only basis. They also did not use anything about his ineligibility or his coming into the United States without any visa. They said we're not going to talk about that because we're just relying on this one reason. Let's talk about the passport. I mean, that seems to be another problem that he has. He's got now a felony conviction under our law for misuse of a United States passport to further an act of international terrorism. And applying straight categorical analysis, why shouldn't we find that that is, in fact, a crime involving moral turpitude under the immigration law? Well, just again, the Convention Against Torture does not differentiate eligibility and non-eligibility based on any kind of conviction. I guess this is all going back to your argument that it was ineffective assistance of his counsel, in essence, to put all of his eggs in the cat claim and to abandon pursuit of these other forms of relief, which if the government is correct to involve crimes of moral turpitude, he would have been statutorily ineligible to obtain those benefits. There are some forms of relief that require an aggravated felony conviction or particularly a serious conviction. Each form of relief, whether it's asylum or withholding of removal or cancellation of removal or adjustment of status, whatever benefit an individual is trying to obtain, they have their own set, as the court knows, they have their own set eligibility requirements. Crime involving moral turpitude in most of those instances is not a... Well, let me ask you a question. Have you applied the categorical approach? Have you thought about that? Yes. Have you? And what conclusion do you reach if you apply the categorical approach? He was convicted of misuse of a passport, 1544, to facilitate an act of terrorism, 2331. All right. What do you conclude when you apply the categorical approach? That misuse of a passport is not a crime involving moral turpitude because there's no fraud involved and that by itself is not a base or vile conviction. And the second part of it is a sentence enhancement. And he did receive a much longer sentence because of that. The Supreme Court said it's an element of the crime under apprendee because it has to be presented to a jury and proven by proof beyond a reasonable doubt. Our case law says that turns it into an element of the offense, not just a sentencing enhancement. The government has to plead and prove it by proof beyond a reasonable doubt. And when he pled guilty to the crime, that's what he pled to. That was one of the elements of the offense. So why shouldn't we apply categorical analysis and conclude that the board was correct in determining that it was a crime involving moral turpitude? Well, if that's so, then it would only apply to the question of whether he was admissible when he came into the United States. That was the only reason for using that because all the other forms of relief were abandoned by the attorney. So can I just ask you, I want to go back to the Kat claim again. Mr. Wynn is in detention right now? No, he's not. He's not? He was released recently on bond. On bond, was it immigration detention or was he serving jail time? It was immigration. Following serving jail time? Yes. Okay. Suppose we were to roll for you on the Kat claim. Suppose we were to find that it's more likely than not that Mr. Wynn would be tortured. What's the result of that finding? If I understand the question, if he receives the Kat relief? I mean, can immigration, since he's out on bond, still detain him? They could, but it's unlikely because they already, without even the Kat approval, they already released him on bond. And based on some of the recent cases having to do with allowing individuals to have a bond hearing even though they may be incarcerated so that there's not... You mean Rodriguez? Yes. The one I just wrote? Thank you. Yes, that's the case. And he did get released on that case. And so if he receives Kat relief, I would think that there would be no basis at all for rearresting him. He's already been found to be a good risk of not fleeing and not a danger to community. So his chances of that being found against him would be much less if he received Kat relief. And then Kat relief entails just a deferral of removal. He could be removed, subject to the risk of removal at any time if the country conditions were to change. That's correct. Yes, that's correct. You want to save some time for rebuttal? Yes, I would like to talk about a convention against torture. I could do that in rebuttal, sure. Thank you very much. May it please the Court, I'm Lyle Gensler from the Department of Justice, and I represent the respondent today. At the outset, we should say that there's, using a categorical approach, a petitioner was found guilty of a crime involved in moral turpitude. Because he entered the country under parole, and when his parole ended... Why don't we go through that, huh? Yes, Your Honor. He was convicted of misuse of a passport under Section 1544 to facilitate an act of terrorism, 2331. Yes, Your Honor. Now, any element of either statute, 1544 or 2331, under which he was convicted, always inherently or categorically involved moral turpitude. We would say that as to the 273.1, the answer is no. You have to show that it's a spouse. Of course, in this case... Wait a minute. Is misuse of a passport categorically fraudulent? Under this Court's case law, probably not. Under virtually every other Court, yes. I'm just asking a question. And we know that under 1544, misuse of a passport also criminalizes traveling to other countries where U.S. passports are invalid, like Libya and Iraq, places like that. And that failing to surrender one's passport to U.S. government on request, neither of those offenses involve fraud. We can go ahead, Your Honor. Yeah, okay. So now let's go to the other approach. Or let's look at the other portion of it. Looking at 2331, is that provision categorically base, vile, or depraved? We would say categorically. The answer to that is yes. Using a passport to facilitate an act of terrorism... No, no, no. We're talking now about elements of a crime. You know, that's where we haven't gotten to the other modified approach. We believe 2331, Your Honor, is categorically a crime of moral turpitude. It has the amount of depravity necessary. That is what we've argued in our brief. A violation that 2331 defines international terrorism to include a wide range of minor and nonviolent conduct. And that can include cooking food for terrorists. 2331... Is that right? No, that's not what 2331 says, Your Honor. Not to my understanding. And 2331... It defines an act of... It defines a wide range of... And that a bank's failure to close a terrorist bank account... That falls in within the definition of international terrorism. Your Honor, 2331-1, which is what he was charged with, defines an act of international terrorism to mean activities that involve violent acts or acts dangerous to human life that would be a criminal violation if committed within the United States or any state and appear to be intended... There are some ellipses here. We're looking at a lot of ellipses. But it covers a wide ground. Well, Your Honor, we firmly believe that is a crime of moral turpitude. You're just looking at the wording of the statute. Yes, Your Honor. There's nothing that says anything about funding terrorism. I cannot find that in the statute. That's in a different provision. That is correct. The statute itself, as it reads categorically, and we're talking about 2331-1 now, is a crime of moral turpitude. And because he was charged... How about the rest of the provisions of the 2331? I'm not sure they matter in this case because they have it as 2331-1. That's what he's charged with. Let's take a quick look, Your Honor. The indictment says, That's very specific, Your Honor. And that's all that the government understands he was charged with. We believe it is a crime of moral turpitude. Well, we'll have to take another look at 2331. Of course, Your Honor. Point one. Well, it's after parenthesis one, but... Parenthesis one, yeah. But yes, Your Honor, that is... So does that include, when you're looking at that, you're saying he's charged with 2331-1. So does that... What was he charged with under B? Under B, Your Honor? Yeah, 1B. I don't have that information right in front of me. I have the indictment in front of me. Okay, well, so... The term international terrorism... I'm looking at the definitions. It has to involve violent acts, dangerous to human lives. That appear to be intended... And these are in the alternative. To intimidate or coerce a civilian population. To influence the policy of a government by intimidation or coercion. Or to affect the conduct of a government by mass destruction. And, Your Honor, again, we believe all three of those, the alternative you just read, all define moral turpitude. Or involve moral turpitude. So it doesn't matter which one he was charged with? No. Because they all... Involve moral turpitude. Face, bile, and deprave. Yes, Your Honor, that is the government's position. Okay, so what is his indictment charging with? To read it again, Your Honor, it says, Beginning on or about April 18, 2001, and continuing until on or about August 30, 2001, in Los Angeles County, within the Central District of California and elsewhere, Defendant Vin Tan Nguyen willfully and knowingly used a passport issued and designed for the use of another to facilitate an act of international terrorism as defined in Title 18 United States Code, Section 2331-1. And did he plead to the charge? As charged. As charged. Yes, he did, Your Honor. Your Honor, that would be on page 1337 of the record. It says, he pled guilty to misuse of a passport in violation of 18, section, 18, excuse me, U.S.C. Section 1544, as charged in count one of the single count indictments. Under this court's holdings in both Vidal and Pervosa, which we've cited to the court, that means he pled guilty to this charge, not to just any misuse of a passport, but to a very specific misuse of a passport for the facilitation of an international act of terrorism. And that is, in the government's view, a crime involving moral turpitude. Now, that being said, that disqualified Wynn from a lot of different types of relief. His attorney originally challenged all that. And in open court, on page 36, I'm sorry, 362 through 63, that's the administrative record, he said he would seek all forms of relief, showing that, and this was an open court with a translator, that it was on the record what types of relief he wanted, including adjustment of status, asylum, cancellation, and withholding. It was only later, after the government, after there was a wide discussion on the record, the immigration judge asked for briefs, the government submitted a very lengthy brief, that petitioner's counsel submitted in open court written pleadings that changed his pleadings, and that he admitted to all the elements, or all the allegations in notice to appear. And the judge said, so the only relief you are seeking is deferral of removal, this is an open court with a translator in front of Mr. Wynn, and the counsel said, yes, that is what we are seeking. Now the question becomes, was that some sort of ineffective assistance of counsel? And no, it was a tactical decision. Setting aside the Lozada issue, and we'll rest on brief on that, we briefed it fairly thoroughly. Once you have this crime involving moral turpitude, you're not eligible, you're inadmissible,  the cancellation, you might plausibly still be entitled to, except we also have the 273.1, abuse of his spouse. Cancellation isn't there, it doesn't necessarily have good moral character? That is only if you're not a legal permanent resident. Because he was charged, or he was a legal permanent resident for this purpose. That is not correct. You don't have to show, he doesn't have to show that, he's got a lesser burden. He would have the status of legal permanent resident for purposes of the cancellation, but not for... Not for his admission into the country. Under 1101A13C, the government had the burden to show by clear and convincing evidence that he fit into one of six categories. One of which, and the one that the board relied on, is not that he was convicted of a crime overseas after he left, but that he committed an offense, misconduct overseas. I don't understand, so the briefs make a big deal about he's not admissible because he's not a lawful permanent resident, he could only be paroled. He is stripped of his, yes, of his LPR status, lawful permanent resident. As to coming into the country. Okay, but for purposes of cancellation, he has it. He was treated as an LPR, yes. Okay. Now the problem is, one, because of his spouse abuse conviction, which occurred less than seven years after he was granted his refugee status, he would not qualify for cancellation of removal, and that's what the board stated. But above and beyond that, as the board stated, he had three convictions. Two in third one in the Philippines, the passport conviction and the spouse abuse conviction. He still has to have or be granted cancellation only in the discretion of the court. Now the question isn't whether the court would have granted discretion. The question is, what was his attorney thinking? What was the likelihood of discretion in that case, especially combined with the spouse abuse conviction that occurred under six years or under seven years before he, oh, I'm sorry, after he was admitted? There's just no chance of cancellation, or very little chance. So there was no. It was a strategic decision by his attorney. Yes, Your Honor. All right. So let me ask you this. How about 1544? Go back to the passport conviction. Yes, Your Honor. Yeah. Okay. Has any court determined whether misuse of a passport to facilitate an act of international terrorism is defined in 2331? Is it crime involving moral turpitude? There are certainly no reported cases. No reported cases. That's of late last week. Okay. And under the categorical approach, 1544, misuse of a passport in and of itself is not categorically fraudulent. Right? I mean, let's look at 1544. Because it prohibits a wide range of conduct that does not involve fraud, including traveling to countries where U.S. passports are invalid, failing to surrender one's passport to the U.S. government upon request. Yes, Your Honor, but that's not what this clause was. 1541 that defines international terrorism is not categorically based, vile, or depraved. Obviously, Your Honor, the government's position is not that. Essentially what you're saying is this is the case of First Depression, and what you would like from us is an affirmative answer and a published opinion. That is correct, Your Honor. Okay. So, can I just go back to Kat for one minute? Do you agree with co-counsel, your opposing counsel, that he is eligible for Kat's release if he shows that it's more likely than not that he would be tortured in Vietnam? That is correct under this court's current principle. Just the Ninth Circuit or every court? Just the Ninth Circuit. We submitted a 28-J letter to this court asking the court to rule on the jurisdictional issue because under 8 U.S. Code 1252A2C, this court should not have jurisdiction to even consider a Kat claim because of the CIMT. This court, in all fairness, has not agreed with what I've just said. Which one? You've submitted so many. Do you remember which one? It would have been the first one probably August 30th, Your Honor. Okay. And what we're relying on, Judge Graber, in a dissenting opinion, cited other courts of law, I'm sorry, other circuit courts that have found there would be no jurisdiction. Again, this court has never so held, and the government understands this court cannot overturn the other panels. It is the law of this court. What we're asking the court to do is to make a ruling on the issue, and we know what the ruling will have to be, but then to refer it to the court en banc to see, to re-look at this issue. Don't worry. No matter how we rule in this case, this is going to go en banc, in my opinion. Yes, Your Honor. I'd be happy to answer further questions. I am well over my time. Well, that's all right. I want to get to the merits of this CAC claim. The indictment itself uses 2331.1. That's actually parentheses one, Your Honor. Yeah, parentheses one. That's in the indictment. That's in the indictment, Your Honor. Yes. Well, I'll use this indictment. In the heading here, it says 18 U.S.C. 1544, Misuse of a Passport. Beginning on or about April the 18th? Then it was about August 30th. Within the central district of California and elsewhere, the defendant, his name is Wilfring Noe, used a passport issued in design for the use of another to facilitate an act of international terrorism as defined in 18 U.S.C. 2331. Specifically, a passport issued as a travel document to depart to the United States and to gain entry to the Republic of Philippines. And as his identity document... Essentially, Your Honor, what we're going to want to say is... His identity document to open bank accounts. I mean, that's not a crime to open a bank account. Using somebody else's name, it is, Your Honor. Huh? Using somebody else's name, that would be fraud. However, we're not at all clear that... Well, we're not, you know, he could have had authorization from a third party to open a bank account in his name, right? That is possible. Yeah, that's why we have the modified approach. And in order to facilitate an act of international terrorism to wit, destruction of property, explosives, well, that's not a good thing to do. But I don't think that you're correct when you say that this falls within the categorical approach. And if you look at 1544... You know, that criminalizes traveling to countries where U.S. passports are invalid, failing to surrender one's passport to the U.S. government on request. So if you use that... If you look at 1544, his conviction is not a crime involving moral turpitude. Again, Your Honor, I understand Your Honor's position. I respect Your Honor's position. That is not the government's position. We believe that using a passport to facilitate... I understand that you believe that. I understand that you believe that, yeah. I don't know if there's anything further I can say about this opposition. Would it fall within the modified categorical approach? We believe it would, although I don't know that we... Again, we don't think we have to get there. The reason we believe... Well, let's say we have to get there. Then we believe that using someone else's passport to open a bank account to commit an act of terrorism is definitely a fraudulent use of that passport. And if indeed, as Your Honor has suggested, that person may have consented to the use, then it is a depraved act, and we believe under that rubric, it would be an act of crime involving moral turpitude. Does that categorically involve fraud? Categorically involve fraud? Fraud requires more than just dishonesty. Well, it requires a fraudulent attempt. It requires an attempt to gain a tangible benefit for oneself. Your Honor, well, going to a bank and not telling them, or lying to them about your identity, not saying that someone gave you permission, but lying about your identity to open a bank account... I'm looking at the modified approach now. I understand you now. Yeah, yeah. We believe under the modified... He was convicted of using someone else's passport. And I'm just asking if that crime always categorically involves fraud. It's kind of a difficult question because... You can't say that it does. He's using somebody else's passport. I do say that it does. I can. I may be wrong. Every time you use someone else's passport, is that fraudulent? Can't we get to the point, though, where there are judicially noticeable documents under the modified categorical approach, which includes the indictment... Yes, Your Honor. ...and the plea to the crime as charged in the indictment. And if we read the language that Judge Pregerson read into the record, then he pled guilty to misuse of a passport to further an act of international terrorism. That is the government's position. Under the modified categorical approach, you get to the same conclusion. Do we have to dischance? How does that weigh into it? I don't know that it does, Your Honor. I don't think it does. I'd be happy to bring that issue to the courts. Don't we have this other case that just came down? I'll think of the names in a minute. It just recently came down. Well, the point is dischance. This is a FinCorp case. That you look at elements and not facts. But the elements of this offense, because of the way it's charged under Apprendi, because it was a sentence enhancement under Apprendi that said, if you do this, you specifically are eligible for... you get a maximum sentence of 25 years, then there are other elements that would give you a lesser sentence. We believe that is an element. Go ahead. I think that concludes my answer to you, Your Honor. Yes, Your Honor. Now, what does DeCamp tell us? It says limiting the categorical approach. That's what it did. The elements, not facts. Just look at the elements. You don't start looking at, you know, what someone wrote in a file or anything else. But, Your Honor, that's why we didn't... Just look at the elements. That's why we didn't go with a more categorical approach to start with. But even under DeCamp's, if you are correct that adding the citation to 2331 converts this into an element where the fourth element is now in furtherance of an act of international terrorism, which increases the punishment, which under Apprendi must be submitted to the jury, our Ninth Circuit case law says that is an element, not a sentencing enhancement. We agree. So it's not a straight 1544 misuse of a passport. The crime is now misuse of a passport in furtherance of an act of terrorism. That is the government's position, Your Honor. So even under DeCamp's, the modified categorical approach would still permit us to reach that conclusion because it is an element and not a fact. We would agree with that, Your Honor. Well, that's not the way I chart it out. Have you got a diagram on this? Have you? Not in front of me. I'd be happy to provide one. Did you ever diagram it? As to the elements? Yeah. Ask them what it takes for modified categorical approach under DeCamp's. No, DeCamp's came out afterwards and we'd always gone with it was a categorical... Yeah, okay. We believe... But DeCamp's controls. Under DeCamp's, well, DeCamp's only controls if it's not an element, and it is an element under the government's view, Your Honor, as Judge Tolman has stated. Well, don't you look for elements in the statute? Yes, and the element in the statute by the Supreme Court's case in Apprendi is that he used his passport to... By what? Apprendi. Apprendi. Yes, Apprendi. Oh, that's... It's a sentence enhancement type case, Your Honor. Yeah, but that... Yeah, I know what it is. That's the case that held... Is that the one that held that the guidelines were unconstitutional but we use them anyway? So, you know, you get something that's unconstitutional and we use them. So... I don't know that I'd categorize the case that way. Well, that's the way it works, isn't it? But for the point of this case... Unconstitutional, but we don't want Senate and Congress to get mad at us, so we'll use them for advisory purposes, see? And we're going to go through the whole process. We're going to go through the whole process. And then if some judge who's had no experience in sentencing someone without the help of the guidelines, which are more complicated than the Internal Revenue Code, then he's got to go through these 3553 elements and spend two days figuring all this out, and then he's got to, you know, give all his reasons, so... Yes, Your Honor. But the practical effect of it is that they're unconstitutional, but don't worry about it. Just go through 3553 and you're going to be all right. Can we get to the cat claim, please? Yes, Your Honor. I just want to go through. I personally did not find Professor Tai's evidence very persuasive. I just wanted you to address some elements of it because the BIA in denying cat relief relied both on this and on the country conditions and on his testimony, correct? I don't believe that is so. I don't believe that Professor Tai's testimony was cited by either the BIA or the IJ. Certainly the IJ did not cite it. I thought the BIA cited it. I guess I'd have to look again. What evidence is there that the government submitted other than that? Well, it was petitioner's burden. Professor Tai was the only witness that the government presented, Your Honor, and that's in response to your question. What the government's position is is that the cat claim is based on a series of assumptions, and one of the key assumptions is that the government of Vietnam is well aware of petitioner and is going to torture him to extract information from him for what he's done. On that, we have several points to make. One, there's no evidence in the record that the government of Vietnam was ever aware that Mr. Nguyen returned to Vietnam secretly. He committed no acts of violence there. He was not arrested there. They had no knowledge of his being there. There's no direct evidence or compelling evidence that they would believe that he has any information about the government of free Vietnam's agents in Vietnam. In fact, he hasn't been there since 2001 or so, which is 13 years. Perhaps most importantly, we do know how the government of Vietnam reacts when they want somebody. When Chan Hu Nguyen was in South Korea and was suspected of committing offenses against Vietnam, Vietnam desperately tried to extradite him. And yet, despite all the publicity that petitioner claims has surrounded his actions, Vietnam has evinced no interest in him whatsoever. There's been no extradition request. There's been absolutely nothing. Now, petitioner presented a lot of witnesses as to prison conditions essentially in Vietnam, but none of them are in the same situation as Mr. Nguyen is. All of them who testified as to being imprisoned had committed acts in Vietnam. The crimes actually occurred there. Two of the women who were members of the government of free Vietnam, but actually belonged to another organization, were agitating for human rights. There was some evidence that they were putting up towers or cell towers to transmit to the Vietnamese. That's much, much different than Mr. Nguyen's situation where he's done nothing in Vietnam. In fact, Mr. Nguyen was found credible, and he is denied he did anything wrong in the Philippines. He was certainly convicted under another name, not his own, but his brother's name, of a lesser-included offense of packing explosives, but that's it. I mean, although there have been some news articles saying what it was for, he's never said what it was for. All of his witnesses have testified that the government of free Vietnam is a non-violent organization, that they've engaged in no bombings, that they don't take life. So what you've got essentially is someone who may be a gadfly outside the country, where there's no direct or compelling information or evidence that he's even known in the country. His situation is dramatically different than the witnesses he presented. Some of the people who he presented, certainly their actions wouldn't be construed as committing terrorism, such as blowing up the Vietnam embassy in the Philippines. I don't think any of them would be considered terrorists in that regard, Your Honor. He was convicted of that. No, Your Honor, he was not convicted of trying to blow up the embassy. No, he was convicted here. Of passport, yes. And the facts underlying that were the creation of explosives, which is all over the record, that were going to be used to blow up the Vietnam embassy. There were a couple of news articles that state that, Your Honor. His own witnesses say that wasn't the case. What was he going to use them for, then? Interestingly, Mr. Tony Nguyen, Chan Hu Nguyen, same name, testified that sometimes they plant explosives with no detonators whatsoever just to show the Vietnamese they're around, but that they don't blow anything up, they don't commit any terrorist acts. That's his own witness who said that. I guess I want you to respond to the argument that he's not just any Vietnamese person returning, that he has been convicted of serious crimes both in the United States and in the Philippines. I think we – as to the United States, yes. As to the seriousness of the Philippines conviction, I can't really say because it's a less inclusive case. I'm saying this takes him out of the ordinary. I mean, the government might be more likely to... Well, and I guess that's where we part company, Your Honor. We don't know that that shows the government would be more likely. That's supposition. Because the only witnesses that we have all talked to crimes that were committed or offenses that were committed in Vietnam. And we haven't shown that the Vietnamese government is aware of this man. We haven't shown that they tried to extradite him, that they've displayed any interest in him. They did not try to extradite him from the Philippines. They did not try to extradite him when he finished his sentence here. So that's his burden to show that they – that Vietnam would take notice of him. Yes, Your Honor. And we believe that what we've got is assumption on assumption. Now, clearly, you know, he's afraid. But it's got to be an objective test. It's not subjective. It's objective. And we don't believe he's met his burden to show that. I am well over time, but I'm happy to answer further questions, Your Honor. And I don't know if I've answered your question to your satisfaction. No, I mean, it's fine. So you're saying that the Vietnamese government, today's Vietnamese government, has no interest in him whatsoever? Not exactly. Your Honor, what we're saying is it's his burden to show there's an interest, and he hasn't met that burden. I mean, you can show an interest by implication. You know, we have people come from certain places that talk about their fears of being tortured and some other evidence comes in that this is a practice in that particular country and all that. But it's our position we don't have that implication here, Your Honor. That's putting it as down and dirty as I can. We can have an implication, but we don't have it here. The burden is on Mr. Wing to show the implication, and he has to do it by more than just an assumption. You're saying that he had nothing to do with seeking to blow up the Vietnamese embassy in Sudan? In Manila, Your Honor. It was in Manila. That's what he is saying. That's what he testified to before the immigration court. And that's what his witnesses testified to. Now, of course, the Philippine conviction speaks a little bit differently, but it was a lesser-included offense of basically possessing explosives. They did not convict him of trying to blow up the Vietnamese embassy. But that was all in his brother's name? It was in his brother's name, yes. He used his brother's passport to travel to Vietnam, allegedly because he'd been sick and he didn't have time to get his own travel documents. He was a legal permanent resident. Yes, at that time. When he left this country, he had refugee status. He was a legal permanent resident. Now, why he didn't have travel documents is a little bit confusing, but he didn't really clarify that, Your Honor. Well, if the government doesn't go into business again soon, I might not have travel documents, because I need to get my passport renewed. Most of my colleagues were not able to travel here this year. I know, we know that. Thank you for coming, by the way. No, I've traveled abroad, and instead of bringing my daughter's passport, I brought my son's, you know. Do we need to admonish you of your constitutional rights? What did you say? Never mind. He doesn't want you to incriminate yourself. He doesn't want you to admit to it. Well, that's all right. I better be 90 soon. Subject to your further questions, that will conclude my argument, and I do appreciate the court's indulgence in giving me extra time. Now, we understand that the DOJ must think this case is very important, because otherwise you're the only attorney who didn't ask for continuance from the DOJ. I was allowed to do that, and I was very thankful to them. Now I'm getting paid, or at least I will get paid at some point. At some point. I do appreciate you telling me all this. Thank you. Don't worry about it. We'll find other sacrifices for you to engage in. Thank you for allowing me to have this additional time. I'd like to talk about the merits. What are you going to do with it? Pardon me? What are you going to do with it? Well, I'm going to talk about the merits and why we asked this court to find that he did prove the Convention Against Torture claim. Every individual, of course, is different. He doesn't have to be compared to somebody who is in Vietnam. He doesn't have to be compared to somebody who the Vietnamese government tried to extradite. Here's the burden of proof of showing that it's more likely than not that he will be tortured if he is sent to Vietnam. So, do you see evidence of that? Okay. Well, first there's the Human Rights Watch report that's in the record. I'm quoting the sentence that's important. It says, there is compelling evidence of torture, including beatings and electric shock of political prisoners in Vietnam. That's something that, you know, the country conditions is extremely important on cases involving cat relief. They know a lot of what is going on in that particular country. They've made that finding. And it has to do not only with torture, but torture of political prisoners, which he would be if he was returned to Vietnam. He's a very public figure. He's involved extremely closely and has been for almost 20 years with the government of free Vietnam. Can you give me the record site? I have the Human Rights Watch report here where it talks about torture of political prisoners. It will take me just a moment. Okay. It is page 1738. Well, none of my pages have 1738 on them. Is that an AR section? Yes. That's in the record. What are you looking at? The Human Rights Watch report. It's 2006. It starts at ER 1046. Well, I know there are three records in this case. There are three petitions to review. Then tell me the subject, the heading. I have page 1738. Do you have it in front of you? Do you have the Human Rights Watch report in front of you? I don't know if I do. Okay. Never mind. Never mind. I'll look for it. It is... So you don't have the report with you? I don't have it here. I left it in my car. I don't have it. I don't have it over the 2000 pages. I probably should have brought it here with me personally. It's... The court has looked at that number and it's not the correct number? Well, I have the Human Rights Watch report here, but I have ER 007 and ER 1046 on the first page. It is pretty critical for your case and for your client. It's in the... The title of these over 100 pages are the Respondent's Additional Supporting Materials, Volume 2.  In addition to that, there is the State Department reports and a couple of other human rights reports. Okay. And I think the final one is the Human Rights... Give me your ER record site where it says political activists or dissidents, you say, are tortured in prison. What it says? I'm sorry. Didn't you just read to me something that said political dissidents are tortured in prison? Yes. I have page 1738 in the certified record. 1738. Yes. Okay. I'm writing it down. All right. What's the other evidence? You say you got it out in your car? It's in your car now? That's... All this? That's the report. Yeah, the report's in your car? Yes. And I have some additional evidence. You sure? In the record. Sure it's in your car? Do you have a list in front of you? Of the evidence? Yeah. What is it? Well, basically it's his leadership in the government of free Vietnam, which is the major organization attempting to totally change the Vietnamese government. They're very well known. They've had many of their members arrested in Vietnam. Tortured? There are a couple that have been tortured. That's on the record. They didn't testify in court themselves, but witnesses who saw them testified that they were tortured. One's name is Khu Pho Chee, F-O-S-H-E-E, placed in solitary confinement for a very long period of time. What's the site for that? The record site? I'll have to get that to the court. I don't have that handy right now. It would take me a while to look in my notes. Okay. I'm sorry. I just think this is probably your client's last chance for relief, and so I would think you would at least have the ability to give us the basis upon which we could say that the BIA got it wrong, that substantial evidence is not supportive of the conclusion. I do have it in my briefs. I'd have to look at my briefs now, but I didn't want to take the court's time. My notes right here don't reflect the page numbers. Well, where is it in your briefs? Where is this information? I think we can find it. If it's in your briefs, we can find it. Don't worry about it. I'm sorry about that. Don't worry about it. That's pretty important stuff for your client, isn't it? I just have a few more reasons for showing why he fears going back to Vietnam. As I said, the record shows that he joined what we'll call the GFVN. That's the Government of Free Vietnam. He joined it in 1995. He went around the world as a member and an organizer for them. He went to Thailand, Cambodia, Vietnam, Australia, Canada, even the United States. His own brother planned to destroy statues of Ho Chi Minh in Vietnam. The government knew well about that. The Los Angeles Times, there's a Los Angeles Times article in the record, reported that Mr. Nguyen was accused of a bombing plot against the Vietnam Embassy in the Philippines. He was and still is the Deputy Chief of Staff of the GFVN. He has been in that position since 1997. There are other articles in the record. I'm sorry, it's in my brief. I can give that to the court, though, later if it wishes. There's a 2001 BBC report in the record of the trial of 37 members of that organization convicted of crimes against the state and sentenced from 12 years to death in Vietnam. There's Washington Post articles about the organization and asked, the Vietnamese government asked the U.S. to curb these unfriendly exile groups. So, of course, the government of Vietnam knows well about the government of free Vietnam. It's all very, not everything is open, of course. There's a lot that is happening in Vietnam that is not open.  But there are, at the same time, many public activities that not only my client, but members of the organization that he's so involved in have participated in. There's no question in my mind that he will be tortured and possibly killed if he goes back to Vietnam. 20 years of activities involving government that he is totally opposed to. He's done all that he can to organize others. He's not just a member of the organization, he's a leader of it, an organization that the country of Vietnam is trying to destroy. Members have already been arrested and tortured.  Do you find him eligible for Convention Against Torture relief? Are there any other questions, I'd be happy to answer them. I don't think I have anything further. So you're going to give us a list of where all this is in the record? I can if the court wishes, sure. Isn't it all cited in your brief? It is. Okay. I mean, we can look it up in the brief. You don't have the briefs. I do have the briefs, yes. Well, give us a list of them. I'd like to see the list. Is it okay if I give it, can I give the court that in the next day or so? Because I have two briefs and I'd have to look through it and give you a variety of different citations. That's fine. It's fine with me. We'll get it in the next couple of days. Okay, great. Is that fine with you, Harry? What did you say? I said I thought it would be fine if you took two days to get us the list in our list form. Yes, that's fine. You can put it in a letter brief and file it electronically with San Francisco, but also have hand-delivered to us here copies of the letter brief. Okay. Okay? Thank you again. All right. Thank you. You want to say something about all this? You're tired? All right. All right, that concludes this session. And we'll recess until 9.30 tomorrow morning.
judges: Pregerson, Wardlaw, Tallman